### AMERICAN RADIUM CO. v. HIPP. DIDISHEIM CO., Inc., et al.

(District Court, S. D. New York. March 5, 1921.)

1. **Patents �köm327—Consent decree in infringement suit held not res judicata as between defendants and assignee of complainant.**

A consent decree in an infringement suit by the patentee of a luminous compound for indicators of clocks, speed gages, etc., adjudged validity and infringement, and granted an injunction, but not an accounting, and it contained no provision that its benefits should inure to assigns of the complainant, who was a manufacturer of watches, while defendants were importers and dealers in watches. Later the patentee assigned the patent to complainant, which is neither a manufacturer nor a dealer, which, after the patentee's death, brought a new suit, asking an accounting. *Held* that, as between the parties to such suit, the consent decree was not res judicata.

2. **Patents ⊫328—911,401, for luminous compound for indicators, held void for lack of invention.**

The Junghans patent, No. 911,401, for a luminous compound for indicators of clocks, speed gages, etc., *held* void for anticipation and lack of invention.

In Equity. Suit by the American Radium Company against the Hipp. Didisheim Company, Inc., and others, for infringement of letters patent No. 911,401, dated February 2, 1909, for luminous substance for indicators. Decree for defendants.

Decree affirmed 279 Fed. ——.

⊫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Redding & Greeley, of New York City (William A. Redding and Ambrose L. O'Shea, both of New York City, of counsel), for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds, W. Brown Morton, and Charles H. Studin, all of New York City, of counsel), for defendants.

MAYER, District Judge. The suit is the usual patent infringement suit for an injunction and accounting. The invention is for "certain new and useful improvements relating to improved luminous substance for indicators containing radium for the indicating members of clocks, speed gages, and the like," and the claims are:

"1. In a clock, speed gage or other similar device an indicator having a recess and a luminous compound in said recess.

"2. In a clock, speed gage or other similar device an indicator formed of two wires fixed together and between them a luminous compound.

"3. In a clock, speed gage or other similar device an indicator having a longitudinal aperture and a luminous compound in said aperture.

"4. In a clock, speed gage or other similar device an indicator having at its outer surface a luminous compound in combination with a dial or the like having its figures or indicating divisions provided with a luminous compound.

"5. A clock, speed gage, or other similar device having a dial provided with a luminous compound in the form of fields or spaces of dotted form located at the figures of the dial, and having an indicator or pointer constructed of two wires fixed together to form between them a longitudinal aperture or recess, such aperture or recess extending substantially the length of the indicator or pointer, and a luminous compound in said recess extending to the outer surface of the pointer."

The radiumized or luminous watch came into vogue in this country when the American troops went to the Mexican border in 1916. The demand for this kind of watch grew greater and greater as the World War progressed, until the business in watches of this character became wide in extent and great in volume. Hence this case, in some of its aspects, is of importance, not only to these litigants, but to the trade at large.

[1] At the threshold is an important, and in some respects novel, question of res adjudicata. In the spring of 1911, the firm of Hipp. Didisheim & Bro. received from their European agents, without solicitation on their part, a consignment of a small number of cheap watches having a luminous composition of some kind applied in some way to their hands and dials. Shortly after the receipt of those watches, this firm was sued by Junghans, the then owner of the patent here in suit, for infringement of the patent. The Didisheim firm turned the matter over to their counsel, with instructions to dispose of the suit with as little cost to them as possible, and pursuant to these instructions the suit was settled with the entry of a consent decree against Hippolyte and Bernard Didisheim for an injunction, but with no provision for profits or damages.

The decree, dated August 26, 1911, adjudged (1) that the patent to Junghans was valid; (2) that "the complainant herein is entitled to the exclusive rights in and to said letters patent," and that the title to the patent was "duly vested in the complainant" Junghans; (3) that "the

defendants have infringed upon the said letters patent"; and (4) that a perpetual injunction issue.

Subsequent to 1911, the following events occurred: (1) On September 13, 1912, Junghans assigned the patent in suit to plaintiff, and the assignment was recorded on July 24, 1913. (2) Prior to the commencement of this suit, Junghans died. (3) On April 29, 1919, Hipp. Didisheim Company, Inc., was incorporated and all the assets of the Didisheim firm were transferred to the corporation. The firm consisted of Hippolyte and Bernard Didisheim. Henri Didisheim in 1911 was quite young and an employé of the firm, and not a partner.

The three Didisheims own all the stock of the corporation and are its directors and officers. Nothing in the record indicates that the change from firm to corporation had any relation to the subject-matter of this suit. It was apparently an ordinary business change from a partnership to a corporation. Junghans was a manufacturer of watches in Switzerland. Plaintiff never manufactured nor sold watches. The Didisheim firm and corporation were and are large importers and dealers in watches.

If Junghans were the plaintiff, he could, of course, enforce the injunction against the Didisheims. Being himself a manufacturer, that might have been all that would have been necessary for his purposes. He is dead, and no one can say whether or not he would have sought an accounting. Nothing in the consent decree provided that its benefits should run to the assigns of Junghans, nor did the decree run against the successors or assigns of the two Didisheims. Defendants do not press the latter point, and it may well be that equity would brush it aside.

But now a different plaintiff appeals to a court of equity to piece out the decree and give to it a valuable right; i. e., an accounting, which was not accorded to Junghans, nor reserved by him for his assigns. Even if there were no authority on the point, I think it is clear that the terms of a decree such as this cannot, in effect, be now changed, so as to be available to a new plaintiff, other than, perhaps, to the legal representative; i. e., executor or administrator of a deceased patentee. But this plaintiff goes even further. In a new suit, it asks for an accounting, when the decree sought to be set up as res adjudicata failed to decree an accounting. Yet, even in contested cases, the right to an accounting is always determined independent of the questions of validity or infringement; and, of course, many decrees fail to award an accounting because, for instance, of laches.

Consent decrees, as their name implies, are the result of an agreement, sometimes precedently expressed in formal stipulation, and sometimes, as here, solely in the decree itself. They are to be read within their four corners, and especially so because they represent the agreement of the parties, and not the independent examination of the subject-matter by the court. They are binding only to the extent to which they go. Neither court nor party can write in them what is not there, and thus change what was agreed upon between the parties.

An alleged infringer, to secure freedom from litigation, might readily consent to a decree for an injunction, but bitterly contest the suit,

if an accounting were sought. On the other hand, the relief desired may well vary with the requirements of the plaintiff. A manufacturer or dealer, owning the patent, may be satisfied if he can stop competition by injunction, and thus retain for himself and practice his lawful monopoly for his sole benefit. An owner of a patent, who is not a manufacturer nor dealer, and who is interested only in royalties, might have little use for an injunction, unaccompanied with an accounting.

The case at bar is thus a striking illustration of the principles laid down in Lawrence Manufacturing Co. v. Janesville Cotton Mills, 138 U. S. 552, 11 Sup. Ct. 402, 34 L. Ed. 1005, and indeed, I think, the facts here present, if anything more persuasive reasons why the Lawrence Case should apply than did the Lawrence Case itself. The very careful analysis of that case by the learned counsel for plaintiff has not succeeded either in impairing its vigor or its applicability to the case at bar. See also Gay v. Parpart, 106 U. S. 679, 1 Sup. Ct. 456, 27 L. Ed. 256.

Of the cases cited by plaintiff it is necessary only to refer to Last Chance Mining Co. v. Tyler Mining Co., 157 U. S. 685, 15 Sup. Ct. 733, 39 L. Ed. 859. In that case the judgment was by default—a judgment just as effective and just as conclusive as a judgment after contest. Such a judgment disposes of everything which could be decided on the issues, and where there is a complaint and no answer, "a failure to answer is taken as an admission of the truth of the facts stated in the complaint." For the reasons outlined supra, it is held that the consent decree herein is not res adjudicata, and that the case must be considered on its merits.

[2] Several defenses are interposed, all worthy of consideration. It is necessary, however, to consider only the question of validity. Radium paint, or the luminous material here employed, was old. An examination of the file wrapper discloses that the luminous substance was really what Junghans thought he had invented, and the patent might well be questioned on its file wrapper history. But its fate can be determined on stronger grounds. Phosphorescent paints had long been applied on the hands and dials of clocks, but they were not self-luminous. In 1898 Madame Curie discovered radium, and it was not long after that when radium paint appeared.

It might well be questioned whether it was invention to apply radium paint, instead of phosphorescent paint. But two well-known men, of high standing and unquestioned integrity, both distinguished students of radium, did apply radium paint before Junghans, and there are thus, in evidence, the Hammer clock and the Kunz watch.

The Hammer clock (Exhibit U) has the radium paint on it now which Maj. Hammer put there in 1903. The paint is on the dial in much the same way as is shown in Figs. 1 and 2 of the Junghans patent. It is also on the hands. It is correctly stated that Hammer did not leave a border of the hand around the radium paint to facilitate reading the time in daylight; but that fact is of no consequence. Plaintiff contends that Hammer did not think of constructing the dial so that the luminous substance would be embedded in the figures on the dial, or that the figures would be imbedded in the luminous substance.

In 1903 Dr. George F. Kunz, the inventor of a radium paint (letters patent No. 789,912), applied radium paint to the hands and dial of his watch, and that watch is in evidence. He spread the paint over the surface of the hands, and put four dots on the dial. He used the watch continually from 1903. A mere inspection of the Hammer clock and the Kunz watch should dispose of the case, although there is a long list of prior art patents and publications which might invite discussion, but for these two devices.

Much was argued as to the imbedding of the radium paint. The problem, it is contended, which Junghans was called upon to solve, was to apply to the hands of a watch a substantial bulk of a luminous compound, consisting of radium and a radio responsive material, so as to obtain high illumination, and so that the luminous compound will not extend above the hand, and to apply to the hands of a watch this luminous compound, so that it would extend substantially the full length of each hand, and to obtain the illumination near the indicating divisions on the dial, so that the watch might be readily read in the dark, as well as in the daytime.

There is nothing in the claims about "bulk." The patent states:

"Preferably the substance is present in some considerable bulk, where a high illumination is required."

No great importance could have been attached to this feature; else it would have appeared in the claims. To apply the substance in considerable bulk obviously did not require knowledge beyond that of one skilled in the art. This was a mere incidental feature, which certainly cannot be said to have required inventive genius.

It is, of course, true that many simple devices have exhibited invention; but on the question of invention a patent case in one art is rarely of much help in deciding whether invention exists in another art. Each case is necessarily controlled by its own facts, and in the case at bar there was nothing left for Junghans to invent.

While the decisions of foreign courts are not controlling, and often not persuasive, because of a different attitude or a different record, it is sometimes comforting to know that other judicial bodies have come to practically the same conclusion, and the fact that the German and Swiss courts, familiar as they must be with the watch industry, have decided adversely to Junghans, is not without interest.

The bill is dismissed, with costs.